**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK**

---

**JEFFREY ANCHOR, et al.,**

                                        **Plaintiffs,**                    04-CV-0300S(Sr)

**v.**


**DIAZ INTERMEDIATES CORPORATION, et al.,**


                                        **Defendants.**

---

## REPORT, RECOMMENDATION AND ORDER

This case was referred to the undersigned by the Hon. William M. Skretny,

pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon

dispositive motions.  Dkt. #94.


Currently before the Court are the following motions:

1.      defendant Stanley Chiras' ("Stanley's"), motion
        to dismiss the complaint against him with
        prejudice based upon a stipulation of dismissal
        executed on behalf of plaintiffs on September
        15, 2008 or motion for summary judgment (Dkt.
        #97);

2.      defendant Clifton Jenney's ("Clif's"), motion for
        summary judgment (Dkt. #102); and

3.      defendant Theodore Jenney's ("Ted's"), motion
        for partial summary judgment on the issue of
        liability.

Dkt. #103.  For the following reasons, it is recommended that Stanley's motion be granted

and that Clif and Ted's motions be granted in part and denied in part.

## BACKGROUND

While working at Olin Corporation, Ted, Stanley, and Don Hollodel decided to start their own company to fill the void left when Olin Corporation decided to terminate production of a certain chemical for pharmaceutical companies. Dkt. #102-14, pp.15-18; Dkt. #102-18, p.14-17. Diaz Chemical Corporation ("Diaz"), was incorporated in 1973. Dkt. #102-2, ¶ 1; Dkt. #103-3, ¶ 8; Dkt. #114-43, ¶ 48.

Diaz purchased the operating facility in Holley, New York in 1974. Dkt. #114-43, ¶ 9. Diaz manufactured specialty chemicals for use in agricultural and pharmaceutical industries from 1974 through 2003. Dkt. #114-43, ¶ 12. Their clients included DuPont, Occidental Chemical and Eli Lilly Pharmaceuticals. Dkt. #102-15, p. 6.

Ted was the Chief Executive Officer, Chairman and Treasurer of Diaz for the duration of the corporation. Dkt. #114-43, ¶ 49. Ted had earned a bachelors degree in chemical engineering from Ohio State in 1949. Dkt. #102-14, p.9.

Stanley was the President of Diaz for the duration of the corporation. Dkt. #102-18, p.22. Stanley has a bachelors degree in chemistry from Lafayette College; a masters degree in organic chemistry from Fordham University; and has completed several courses toward his Ph.D. in chemistry at the University of Buffalo. Dkt. #102-18, p.7.

Ted's son, Clif, began working for Diaz in 1975, following his graduation from Ohio State with a degree in business administration. Dkt. #102-9, pp.8-9 & 11. Clif

was the Corporate Secretary and Vice President of Administration from approximately 1980 through 2003. Dkt. #102-5, ¶ 3. In his capacity as Vice President of Administration, Clif was responsible for handling personnel issues, insurance issues, finance issues, banking, payroll, information technology, office space, and inventory. Dkt. #102-5, ¶ 3. Jeff Gaynier, the Vice-President of Research and Development at Diaz, testified at his deposition that Clif was responsible for making sure that Diaz "complied with federal regulations having the environmental manager underneath him to provide information, but Clif would be the one to make decisions related to that." Dkt. #1-2-22, p.30. Clif "wasn't involved in the chemistry of the business." Dkt. #102-11, p.28.

When Don Hollodel left Diaz around 1985, he sold his shares to Ted and Stanley. Dkt. #114-43, ¶ 53. Greg Goodrich was hired as Plant Manager and Vice President of Manufacturing to replace Don Hollodel. Dkt. #102-18, p.29.

Margaret Bonn was hired as the first environmental manager in 1987. Dkt. #102-10, pp.5-6. The environmental manager handled dealings with the regulatory authorities, such as the Environmental Protection Agency ("EPA"), and New York State Department of Environmental Conservation ("DEC"), including audits, and handled waste disposal for the facility. Dkt. #102-13, pp.17 & 19-20. The environmental manager reported to the plant manager who reported to Ted. Dkt. #102-14, p.40. Dkt. #102-10, p.7-8. Ted testified at his deposition that he had limited exposure with the DEC. Dkt. #102-14, p.43. However, Dan Walsh, an environmental engineer with Region 8 of the DEC, inspected the Diaz facility on March 12, 1990 and noted that he discussed air emission issues with Margaret Bonn and Ted. Dkt. #114-6.

By letter dated January 7, 1992, addressed to Clif and Margaret Bonn regarding a recent release of chemical gases at the Diaz facility, the New York State Assistant Attorney General advised Diaz that

> Our office conducted an initial review of information about the Diaz Chemical Company plant in 1990. Information indicated almost three times as many fugitive emissions than permitted emissions from the plant. Further, chemicals like those used at the plant had been found in off-site ambient air. Further, there was a well-documented history of odor complaints. At the time of our review, there did not appear to be an established accident prevention plan in effect at the plant, nor was there a community notification or alarm system in place at the plant, although there had been a history of past spills and releases. During the past year, I have become aware that there is documented groundwater contamination at the plant and that there were several instances of Article 17 (SPDES) violations. All of these factors increase our level of concern about this plant site. Please advise us what efforts the company has taken to abate and address these problems.

> Further, we call upon the company to take measures to reduce fugitive emissions, reduce chemical spills, reduce off-normal conditions and eliminate the risk of substantial accident conditions as occurred on December 26, 1991.

Dkt. #114-11, p.4. In response, Clif and Margaret Bonn advised the Assistant Attorney General that

> the air permits recently issued to Diaz include a special condition for an aggressive reduction in fugitive emissions . . . This is well beyond what is currently required of other chemical industry [sic] operating in New York.

> The detection of chemicals off-site by the TAGA Unit has been presented to Diaz by the Bureau of Air Toxics, DEC. The latest results available indicate that none of the targeted compounds were detected at levels above detection limit (1-3 ppb) . . . .

* * *

-4-

> Groundwater quality was voluntarily tested by Diaz, and the results were provided to the DEC. We continue to work with the DEC in this matter.
>
> We are unaware of any SPDES violations, and further the Regional Water Engineer of the DEC, the regulating agency in these matters, is unaware of any outstanding SPDES issues.

Dkt. #114-12, pp.5-6. Clif subsequently suggested to the Assistant Attorney General that the concerns raised would be best addressed through the Best Management Practices Plan being drafted as part of the Special Conditions to Diaz' recently renewed air permits. Dkt. #114-13.

Clif denies any involvement in the operations of Diaz, including the technical aspects of environmental compliance. Dkt. #102-5, ¶ 4. Clif identified plant managers Don Howedell, Greg Goodrich and Randall Wilterdink and safety, health and environmental managers Margaret Bonn and Ronald Reid as responsible for such concerns. Dkt. #102-5, ¶ ¶ 6-7. Ronald Reid replaced Margaret Bonn when she left employment at Diaz. Dkt. #102-10, p.7. Ronald Reid reported to the plant manager and Ted. Dkt. #102-10, pp.7-8.

Clif affirms that the safety, health and environmental managers were responsible for maintaining Diaz' environmental permits and conferring with environmental regulatory agencies, including the DEC and the EPA. Dkt. #102-5, ¶ 9. Clif described his only involvement with environmental decisions as follows:

> The only involvement I had with the environmental regulatory agencies was to calculate, in my capacity as the Vice President of Administration, whether Diaz could afford to pay

for proposed environmental compliance processes. I never determined what processes should be implemented to meet environmental regulatory compliance. These decisions were jointly made by the environmental manager, the regulatory agencies and outside engineering firms. After the environmental compliance processes decisions were made by these persons, and an estimated budget was determined, I would calculate if Diaz, as a company as a whole, would be able to afford the estimated budget.

Dkt. #102-5, ¶ 12.

In 1992, Diaz was listed on the New York State Registry of Inactive Hazardous Waste Disposal Sites by the DEC and negotiated a consent order which required remediation of ground water contamination. Dkt. #102-11, pp.9-10; Dkt. #114-43, ¶ ¶ 23 -24.

In 1996, Stanley moved to Florida, but still worked full-time to generate sales for Diaz, primarily with international customers. Dkt. #102-9, pp.32-33; Dkt. #102-11, pp.31-32; Dkt. #114-43, ¶ 58. At that point, Al Crawford had been hired as Vice President of Sales and was handling domestic sales and Marc MacClaren was handling client contact with existing customers in his position as product manager. Dkt. #102-11, p.32.

Randy Wilterdink was hired as Director of Long Range Planning at the Diaz facility in 1997 and replaced Greg Goodrich as Plant Manager and Vice President of Long Range Planning in 1998. Dkt. #102-28, pp.9-10. As plant manager, Mr. Wilterdink was responsible for all manufacturing and maintenance activities at the Holly facility. Dkt. #102-28, p.10. Mr. Wilterdink reported directly to Ted. Dkt. #102-29, p.15.

Ted testified at his deposition that at this point in time, "[d]ay-to-day, week-to-week decisions were made between Wilterdink, myself, and possibly Clif," including decisions about what type of equipment to install or utilize and what production processes to run. Dkt. #102-14, pp.46-47. For example, Ted explained: "if Wilterdink lost a mechanic, let's say, and he wanted to replace him, he would have to get a blessing from Clif and I at least, okay?" Dkt. #102-17, p.38. Ted continued:

> Stanley wouldn't bother to get involved in something like that just because he really was doing marketing. That was his business. But Clif would come to me and say this is what Wilterdink wants to do. He would talk to Wileterdink, Wilterdink comes to him, and I might say no, because business is getting smaller, not bigger. That would be the type of play there might be as far as Clif or I with Wilterdink.

Dkt. #102-17, p.38. Ted also noted that he and Clif and Randy Wilterdink sat 20 feet apart from each other and spoke "often." Dkt. #102-17, p.38. Clif indicated that "[a]ll the management staff basically did report to Ted Jenney." Dkt. #102-9, pp.35-36. Clif testified at his deposition that he reported to Ted. Dkt. #102-9, p.34.

Ted worked at the facility for half days from about 1997 through 2002 and was responsible for costing, working with research and development, analyzing chemical aspects of new products Diaz was evaluating for customers, process engineering, chemistry and improvements. Dkt. #102-15, p.23; Dkt. #102-17, p.48; Dkt. #114-43, ¶ 62. He denied any direct supervision of the plant, but was "available for people to talk to" if they "had a question" on a "day-to-day" basis . Dkt. #102-17, p.49. He came to the office on a daily basis. Dkt. #102-9, p.33. Marc MacClaren described Ted as the "go-to guy," explaining:

> If somebody had a problem, Ted was the guy who you went to with your problem. Whether it was an engineering problem or even a financial or a marketing problem, he had a lot of experience and would try to help, and he was always at the site pretty much.

Dkt. #102-25, p.26. Marc further explained that Ted "would take processes and look at them and see if there were ways we could improve them from safety productivity and those sorts of things." Dkt. #102-25, pp.26-27. Ted met with representatives of the DEC and was the main contact for the Holley Environmental Action Committee ("HEAC"), a neighborhood organization concerned about emissions and odors from the facility. Dkt. #114-43, ¶ ¶ 64 & 65.

By August, 2001, Diaz was preparing to manufacture chlorofluorophenol for Novartis to use in a new arthritis drug. Dkt. #114-20; Dkt. #102-16, p25; Dkt. #102-11, p.69; Dkt. #114-43, ¶ 31. Stanley managed the relationship with Novartis and Jeff Gaynier managed production. Dkt. #102-9, pp.37; Dkt. #114-43, ¶¶ 27 & 30. By Interoffice Memorandum dated August 2, 2001, Ted, Jeff Gaynier and Marc MacClaren informed Stanley that

> We are presently processing our first commercial (multi-ton) quantity of the key intermediate for 2-Chloro-6-Fluorophenol, o-Fluorophenol. This product requires the production of two intermediates. We have completed the first step and are now producing several tons of the second step. We will be converting this on to the o-Fluorophenol during the month of August.
>
> Our preliminary results indicate that there will be some level of Bromine containing impurities in the o-Fluorophenal unless an extra purification step is added. We need to discuss the processing of this material as well as the 2-Chloro-6-Fluorophenol product with Novartis' technical personnel in order to decide how to proceed.

> We have production capacity available for over 100 tons/year
> of the o-Fluorophenol, providing we can meet a specification
> (as yet to be determined) for this product. We have
> scheduled production of 50,000 kg of the key intermediate, o-
> Bromofluorobenzene, starting in the fourth quarter of 2001.
> This intermediate is a "regular" Diaz product.

Dkt. #114-20.

While they were attempting to manufacture the chlorofluorophenal, Mr. Gaynier would speak with Ted frequently. Dkt. #102-12, p.59. Mr. Gaynier testified at his deposition that Ted was his direct supervisor during the time period that Diaz was developing the chlorofluorophenal. Dkt. #102-23, p.7. Marc MacClaren testified at his deposition that Ted and Jeff Gaynier were making the decisions as to how to purify the chlorofluorophenal. Dkt. #102-25, p.6. Ted had informed Stanley that the chlorofluorophenal would need to be provided to the purchaser in liquid form. Dkt. #102-17, pp.1-3. Ted also indicated that he had decided to halt further development of the chlorofluorophenal until Diaz had received a purchase order for the product but that the release occurred before he implemented that decision. Dkt. #102-17, p.10.

Clif was aware that the manufacturing process for chlorofluorophenal had begun and that Novartis had yet to place an order for the chemical as of January 5, 2002, but did not know whether Novartis had been sent or inspected any of the chemical. Dkt. #102-11, pp.36-37. Clif never spoke with anyone from Novartis. Dkt. #102-11, p.130.

On January 5, 2002, chemicals in a chemical process tank at Diaz overheated and the resulting pressure generated from the steam exceeded the pressure

for the rupture disk, causing the release into the atmosphere of chlorofluorophenal and toluene.  Dkt. #114-43, ¶ 32.  The release was caused by operator error, *to wit*, failure to monitor the temperature of the chemical process tank and open the scrubber vent.  Dkt. #102-12, p.60; Dkt. #102-28, pp.15-16; Dkt. #115-43, ¶ 33.

Randy Webster, the assistant lead operator who was on duty at the time of the rupture, called Randy Wilterdink and Clif to inform them of the release.  Dkt. #Dkt. #102-11, p.41; Dkt. #102-28, p.12.  Mr. Wilterdink arrived at the facility within 15 minutes of the release.  Dkt. #102-28, pp.12-15.  Clif also arrived at the facility and participated in a discussion with local government officials and emergency responders about the appropriate response to the release.  Dkt. #102-11, pp.45-50.  Clfiton Jenney approved hotel accommodations for nearby residents affected by the release and spoke to residents about the incident at a community meeting on January 16, 2002.  Dkt. #102-11, p.150; Dkt. #102-12, p.15.  Mr. Wilterdink indicated that Clif "was an integral part of the investigation and the media coordinator, he was the contact person for the media."  Dkt. #102-29, p.17.  Ted had no knowledge of the release until he reported for work on Monday morning, January 7th.  Dkt. #102-17, p.14.

Chlorofluorophenal is classified as hazardous waste pursuant to the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* and Article 27 of New York's Environmental Conservation Law ("ECL").  Dkt. #114-43, ¶ 42.  The spray from this release allegedly contaminated plaintiffs' property and caused plaintiffs physical discomfort, including headaches, nausea, vomiting, respiratory distress, bloody nasal

discharges, skin burns and irritation, eye injury and irritation, and increased risk of future disease. Dkt. #1. Tests revealed the presence of chlorofluorophenal in the urine of some of the plaintiffs. Dkt. #114-43, ¶ 47.

Daniel Walsh, an environmental engineer with Region 8 of the DEC, visited the Diaz facility on January 8, 2002 and spoke with Ron Reid, Marc MacClaren and Ted. Dkt. #102-29, pp. 81. Mr. Walsh was involved in the cleanup protocol for the neighborhood following the release. Dkt. #102-29, pp.92-93. Mr. Walsh had been involved with the facility and responding to neighbor complaints of fugitive odors since the 1980's. Dkt. #102-29, p.123. Mr. Walsh explained that during the 1991 renewal process for the air permit, he worked with Diaz to create a best management practice plan and felt that complaints decreased following the implementation of that plan. Dkt. #102-29, p.123. Margaret Bonn and Ron Reid were Mr. Walsh's contacts at the Diaz facility. Dkt. #102-29, p.101.

Stanley, Ted and Clif decided to terminate development of chlorofluorophenal following the release. Dkt. #102-17, p.31.

Clif reported on the incident at a public meeting on January 16, 2002. Dkt. #114, ¶ 29.

Clif signed a letter to the DEC dated February 26, 2002 requesting approval of Diaz' voluntary clean up program application. Dkt. #102-12, pp.26-27.

Plaintiffs commenced litigation against Diaz on May 15, 2002. *Anchor v. Diaz Chemical Corp.,* 02-CV-357 at Dkt. #1. That case was stayed on June 24, 2003 following Diaz' bankruptcy. *Anchor v. Diaz Chemical Corp.,* 02-CV-357 at Dkt. #36.

Plaintiffs commenced this action against Diaz Intermediates Corporation ("DINT"),[1] as the successor-in-interest to Diaz; Clif; Ted; and Stanley on April 15, 2004, alleging the following causes of action:

1.  liability as an owner/operator pursuant to section 107 of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607;

2.  declaratory judgment that defendants are liable under CERCLA for necessary response costs consistent with the National Contingency Plan;

3.  common law negligence;

4.  common law trespass;

5.  common law strict liability for ultra hazardous activities;

6.  common law nuisance;

7.  common law gross negligence;

8.  strict liability for violation of Article 37 of the ECL;

9.  equitable relief in the form of a trust fund to provide continued monitoring of plaintiffs' property and health; and

10. common law public nuisance.

---

[1] Stanley, Ted and Clif incorporated DINT on April 15, 1991 and constructed a production facility in Arkansas between 1996 and 1998. Dkt. #102-12, pp.36-37. At its peak, the DINT facility in Arkansas employed approximately 20 people. Dkt. #102-12, p.37.

Dkt. #1.  Although plaintiffs agreed to discontinue their claims against defendant Stanley,

his co-defendants declined to sign the stipulation.  Dkt. #98-2; Dkt. #114-43, ¶ 8.

**DISCUSSION AND ANALYSIS**

**Operator Liability Pursuant to CERCLA**

Plaintiffs seek to hold Ted and Clif personally liable as operators under

CERCLA.  Dkt. #114-42, p.2.

Section 107(a) of CERCLA imposes liability for the cost of environmental

remediation upon, *inter alia*, the operator of a facility.  42 U.S.C. § 9607(a).  An operator

is defined in pertinent part as "any person . . . operating" a facility.  42 U.S.C.

§ 9601(20)(A).  Recognizing the tautology of this definition, the Supreme Court has

explained that an operator is

> someone who directs the workings of, manages, or conducts
> the affairs of a facility.  To sharpen the definition for
> purposes of CERCLA's concern with environmental
> contamination, an operator must manage, direct, or conduct
> operations specifically related to pollution, that is, operations
> having to do with the leakage or disposal of hazardous
> waste, or decisions about compliance with environmental
> regulations.

*United States v. Bestfoods,* 524 U.S. 51, 66-67 (1998).

Although the imposition of operator liability does not require a finding that

the defendant directly participated in the day-to-day activities of the site, an operator

must be actively involved in decisions regarding disposal of hazardous substances or

environmental compliance on a frequent, regular or ongoing basis. *City of New York v. New York Cross Harbor R.R. Terminal Corp*., No. 98 CV 7227, 2006 WL 140555, at *12 (E.D.N.Y. Jan 17, 2006); *see United States v. Green*, 33 F. Supp.2d 203, 217 (W.D.N.Y. 1998) (to be held liable as an operator, individual must directly participate in the management of the facility's pollution control operations including decisions pertaining to the disposal of hazardous substances and compliance with environmental regulations).

Although the statutory definition of operator explicitly excludes "a person who, without participating in the management of a . . . facility, holds indicia of ownership primarily to protect his security interest in the . . . facility," 42 U.S.C. § 9601(20)(A), by implication, "an owning stockholder who manages the corporation . . . is liable as an 'owner or operator.'" *State of New York v. Shore Realty Corp*., 759 F.2d 1032, 1052 (2d Cir. 1985). The critical question is whether, in degree and detail, actions directed to the facility by the parent corporation or corporate officers are eccentric under accepted norms of oversight. *See Bestfoods*, 524 U.S. at 72. "Eccentric behavior for a shareholder includes becoming directly or heavily involved with a facility's environmental and regulatory matters, actively participating and exerting control over environmental matters, or issuing directives on how to respond to regulatory inquiries." *State of New York v. B.B. & S. Treated Lumber Corp*., No. 02-CV-1358, 2007 WL 2908211, at *2 (E.D.N.Y. Sept. 30, 2007).

In *Cross Harbor*, for example, the district court determined that the following facts raised a genuine issue of material fact concerning the depth of involvement of Robert Crawford, the owner and CEO of the contaminated facility, but did not demonstrate conclusively, as required for summary judgment, that Crawford had the level of involvement required for a finding of operator liability:

> (1) his signature on one solid waste permit application, (2) his designation as a contact person on that solid waste permit, (3) his signature on a Solid Waste Management Facility Inspection Report as the "Individual in Responsible Charge," (4) some correspondence between Crawford and the DEC concerning an odor control plan and some other improvements designed to bring the facility into compliance with environmental regulations vis-a-vis the operations of Merco and Safety Clean, and (5) the testimony of two witnesses who said Crawford was present at the First Avenue Yard on a daily basis and generally described him as "the boss" or "number one" at Cross Harbor but did not testify that they ever saw or heard Crawford direct anyone regarding waste disposal.

2006 WL 140555, at *14. Similarly, the Hon. Leslie G. Foschio found a question of fact as to defendant's liability as an operator where the defendant stockholder acted as a paid consultant for the corporation performing services related to all activities and operations of the corporation, was in almost daily contact with the operating officers of the corporation and made recommendations to the operating officers and to the Board of Directors. *Idylwoods Assoc's. v. Mader Capital*, 915 F. Supp. 1290, 1307-10 (W.D.N.Y. 1996), *aff'd in relevant part upon reconsideration*, 956 F. Supp. 410, 413-14 (W.D.N.Y. 1997).

Ted

Ted argues that he cannot be held liable as an operator because he was not directly involved in the management of the facility's pollution control operations or environmental compliance efforts. Dkt. #114-21, pp.19-20. Ted asserts that the production manager managed the manufacturing operations and the environmental manager had authority over compliance with environmental regulations and he was not involved in such decisions. Dkt. #114-21, pp.20-22.

The Court finds there is a question of fact as to Ted's status as an operator of the Diaz facility. Ted maintained an office at the Diaz facility and reported to the Diaz facility on a daily basis. Dkt. #102-9, p.33; Dkt. #102-17, p.38. The plant manager, Randy Wilterdink reported directly to Ted, and Ted testified at his deposition that "[d]ay-to-day, week-to-week decisions were made between Wilterdink, myself, and possibly Clif," including decisions about what type of equipment to install or utilize and what production processes to run. Dkt. #102-14, pp.46-47. Marc MacClaren described Ted as the "go-to-guy" and explained that

> If somebody had a problem, Ted was the guy who you went to with your problem. Whether it was an engineering problem or even a financial or a marketing problem, he had a lot of experience and would try to help, and he was always at the site pretty much.

Dkt. #102-25, p.26. Ted agreed that he was "available for people to talk to" if they "had a question" on a "day-to-day" basis. Dkt. #102-17, p.49. In addition, Ted was involved in reviewing processes at the facility to determine "if there were ways we could improve them." Dkt. #102-25, pp.26-27.

Moreover, Ted was actively involved in the production of the chemical which caused the environmental concerns at issue in this lawsuit. Jeff Gaynier, the Vice-President of Research and Development, spoke with Ted "frequently" and reported directly to Ted during the development of the manufacturing process for the chlorofluorophenal. Dkt. #102-12, p.59; Dkt. #102-23, p.7. Marc MacClaren understood that Ted and Jeff Gaynier were making the decisions regarding the process for purifying the chlorofluorophenal. Dkt. #102-25, p.6. Ted determined that the chlorofluorophenal should be maintained as a liquid. Dkt. #102-17, pp.1-3. Ted's consistent presence and pervasive participation in the daily operations of the Diaz facility, particularly with respect to the production of the chlorofluorophenol which was released into the environment raise a clear question of fact as to Ted's status as an operator of the Diaz facility. Accordingly, it is recommended that Ted's motion for summary judgment be denied.

Clif

Clif argues that he did not actively participate in or exercise control over the operations and environmental compliance at the Diaz facility. Dkt. #102-40, p.5. Specifically, Clif argues that his responsibilities were administrative and that he lacked the education or training to be involved in decisions regarding the production and handling of chemical products. Dkt. #102-40, pp.9-11. Cliff affirms that he did not supervise any of the individuals involved in the chemical production process, including the chemical operators, production foreman, plant managers, maintenance and engineering manager, vice-president of research and development, lead operator and assistant lead operator. Dkt. #102-5, ¶ 16.

The Court finds that there is a question of fact as to whether Clif was an operator of the Diaz facility. Clif received and signed correspondence with the New York State Attorney General regarding fugitive emissions at the Diaz facility; participated in meetings with the DEC regarding the consent order for remediation of the facility following its inclusion on the New York State Registry of Inactive Hazardous Waste Disposal Sites; signed a letter to the facility's neighbors following the release of chlorofluorophenol; and signed the letter to the DEC requesting approval of Diaz' voluntary clean up program application following that release. Dkt. #102-11, p.14; Dkt. #102-12, pp.26-27; Dkt. #114-11, p.4; Dkt. #114-12, pp.5-6. Moreover, although there is no evidence that Clif was specifically involved in the production process for the development of chlorofluorophenol, Ted testified at his deposition that "[d]ay-to-day, week-to-week decisions" about what type of equipment to install or utilize and what production processes to run were made between himself, Randy Wilterdink "and possibly Clif." Dkt. #102-14, pp.46-47. Ted also indicated that he and Clif and Randy Wileterdink sat in close proximity to each other and spoke "often." Dkt. #102-17, p.38. These facts are sufficient to raise a question of fact as to Clif's status as an operator of the Diaz facility. Accordingly, it is recommended that Clif's motion for summary judgment be denied.

Stanley

Although plaintiffs agreed to a voluntary dismissal of this action against Chiras, the remaining defendants declined to sign the stipulation of dismissal (Dkt. #98-2), thereby precluding a voluntary dismissal pursuant to Fed. R. Civ. P. 41(a)(1)(A)(ii).

Although it remains unsettled whether the relief requested is more appropriately granted pursuant to Rule 15[2] or Rule 21[3] or Rule 41(a)(2)[4] of the Federal Rules of Civil Procedure, the Court has no concerns about the appropriateness of granting the relief requested. *See Procapui-Productores de Camaroes De Icapiu Ltd. v. G.F. Higgins, Inc.*, No. 07-CV-6627, 2008 WL 3338200, at *2 n.2 (S.D.N.Y. Aug. 8, 2008); *Allen v. Indeck Corinth Ltd. Partnership,* 161 F.R.D. 233, 235-36 (N.D.N.Y. 1995); *Broadway & Ninety-Sixth St. Realty Corp. v. Loew's Inc.*, 23 F.R.D. 9, 11-12 (S.D.N.Y. 1958). There are no cross-claims pending between the defendants and no claim that Stanley is an indispensable party. Moreover, the record before the Court does not suggest any prejudice to the remaining defendants should Stanley be dismissed from this lawsuit. Accordingly, it is recommended that Stanley's motion to dismiss the complaint with prejudice as to him be granted.

**ECL Claim**

Clif argues that article 37 of the ECL does not recognize a private cause of action. Dkt. #102-40, p.22.

Section 37-0107 of the ECL provides that "[n]o person shall store or release to the environment substances hazardous or acutely hazardous to public health, safety or

---

[2] " . . . a party may amend its pleading only with the opposing party's written consent or the court's leave."

[3] "On motion or on its own, the court may at any time, on just terms, add or drop a party."

[4] " . . . an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper."

the environment in contravention of rules and regulations promulgated pursuant hereto."

The enforcement of this statute is provided for in section 71-3703 of the ECL, which

states that:

> Any person who violates any of the provisions of, or who fails
> to perform any duty imposed by section 37-107 or any rule or
> regulation promulgated pursuant hereto, shall be liable for a
> civil penalty not to exceed two thousand five hundred dollars
> for each such violation and an additional penalty of not more
> than five hundred dollars for each day during which such
> violation continues, and, in addition thereto, such person may
> be enjoined from continuing such violation.

Section 71-2727(2) states that the Attorney General "may initiate any appropriate action

or proceeding to enforce any provision of article . . . 71 or any rule or regulation

promulgated pursuant thereto and any order issued or penalty assessed pursuant to this

title." As a result, the New York State Appellate Division, Fourth Department has

concluded that "the statute does not confer a private cause of action." *Town of Wilson v.

Town of Newfane*, 181 A.D.2d 1045 (4th Dep't 1992)(alleged violation of article 27 of the

ECL). The Appellate Division, Second Department has reached the same conclusion.

*Nowak v. Madura*, 304 A.D.2d 733 (2nd Dep't 2003)(alleged violation of ECL § 15-

1947(2)). Most recently, the district court in the Western District of New York has

concluded that "the weight of authority in New York is that the ECL does not provide a

private right of action." *Kalden Construction Co. v. Hanson Aggregates New York, Inc.*,

No. 08-CV-6200, __ F. Supp.2d __, 2009 WL 1514662, at *3 (W.D.N.Y. May 29, 2009)

(alleged violation of article 27 of the ECL). As this analysis should apply with equal force

to the alleged violation of article 37 in the instant case, it is recommended that plaintiffs'

eighth cause of action be dismissed.

**Common Law Claims**

Ted and Clif argue that they cannot be held liable for any of plaintiffs' common law claims because plaintiffs have failed to allege, and the facts fail to suggest, any basis to pierce the corporate veil to hold defendants liable for such claims. Dkt. #102-40, pp.19-21; Dkt. #114-21, pp.8-15.

Plaintiffs respond that Theodore and Clif can be held personally liable for the common law claims based upon their personal involvement in the commission of the torts alleged. Dkt. #114-42, pp.11-17.

Plaintiffs are correct that "corporate directors and officers who commit or participate in the commission of a tort, even if it be for the corporation's benefit, can indeed be held personally liable for any ensuing injuries." *Van Wormer v. McCasland Truck Center, Inc.*, 163 A.D.2d 632, 635 (3rd Dep't 1990); *see Key Bank of New York v. Grossi*, 227 A.D.2d 841, 843 (3rd Dep't 1996) ( "Personal liability will be imposed . . . upon corporate officers who commit or participate in the commission of a tort, even if the commission or participation is for the corporation's benefit.").

"The general rule is that an officer of a corporation who participates in the commission of a tort by the corporation is personally liable therefor." *Clark v. Pine Hill Homes, Inc.*, 112 A.D.2d 755 (4th Dep't 1985). However,

> A corporate officer is not held liable for the negligence of the corporation merely because of his official relationship to it. It must be shown that the officer was a participant in the wrongful conduct.

*Id.* In other words, the corporate form

> does not provide any protection to corporate agents or
> owners with respect to their own liabilities and obligations,
> incurred as a result of their own acts. To the contrary, when
> an individual, acting as a disclosed agent for a corporation,
> commits a tort in the course of his or her agency, the agent is
> personally liable.

*DER Travel Services, inc. v. Dream Tours & Adventures, Inc*., No 99 Civ. 2231, 2001 WL
1160598, at *3 (S.D.N.Y. Sept. 27, 2001). As a result, where the claim is that the
individual "himself committed torts for which he is personally liable" the individual's status
as a corporate officer is immaterial – if the individual "committed the torts and thereby
caused injury, he is personally liable to plaintiff regardless of the fact that he was acting
as an agent and regardless of whether [defendant corporation's] corporate veil should be
pierced." *Id.* at *4.


Since plaintiffs need not pierce the corporate veil in order to allege tort
claims against the defendants as individuals, it is recommended that defendants' motion
for summary judgment be denied.


## CONCLUSION

For the reasons set forth above, it is **RECOMMENDED** that defendant
Stanley Chiras' motion (Dkt. #97), to dismiss the complaint as to him be **GRANTED;**
and that defendant Clifton Jenney's motion (Dkt. #102) and defendant Theodore
Jenney's motion (Dkt. #103), for summary judgment be **GRANTED** with respect to the
eighth cause of action alleging violation of Article 37 of the ECL, and **DENIED** with
respect to the remaining causes of action.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

       The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

Dated:        Buffalo, New York
                August 18, 2009

                                 **s/ H. Kenneth Schroeder, Jr.**
                                 **H. KENNETH SCHROEDER, JR.**
                                 **United States Magistrate Judge**